No. 22,362.

W. T. APPLE, *Appellee,* v. WESLEY M. SMITH, *Appellant.*

SYLLABUS BY THE COURT.

1. PARTNERSHIP—*Evidence Sustains Existence of a Partnership—Accounting Between Partners.* The evidence herein examined, and found to be sufficient to sustain the finding of the court that a partnership relation existed between the plaintiff and the defendant in certain mining leases, as well as in other lines of business, and also sufficient to support the accounting that was made and the judgment that was rendered.

2. SAME—*Jurisdiction of Court—Dissolution of Partnership—Disposition of Partnership Property Outside the State—Division of Partnership Assets.* It was competent for the court, sitting as a court of equity having personal jurisdiction of the parties, to adjudge the dissolution of a partnership, the disposition of partnership property in mining leases outside of the jurisdiction of the court and beyond the limits of the state, and to make a division of partnership assets.

Appeal from Cherokee district court; JAMES N. DUNBAR, judge. Opinion filed December 6, 1919. Affirmed.

*S. C. Wescott,* of Galena, *Hiram W. Currey,* of Joplin, Mo., and *A. Scott Thompson,* of Miami, Okla., for the appellant.

*Edward E. Sapp,* and *E. B. Morgan,* both of Galena, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:   This action was brought by W. T. Apple against Wesley M. Smith to determine the rights and interests of the parties in a joint venture or partnership in hay business, farm leases, and also in the taking of mining leases upon lands in Kansas and Oklahoma for the purpose of prospecting, mining, subleasing and developing the same; and he also asked for a dissolution of the partnership and an accounting between the partners.   The defendant denied the existence of a partnership relation, except as to certain farm leases, hay business, and insurance business, and a small mining lease in Oklahoma.   He alleged that all other mining leases claimed by plaintiff to be included in the partnership belonged to the defendant and were leases in which the plaintiff had no interest.   The issues were submitted for findings of fact and law to Judge A. S. Wilson, as referee, and after a protracted trial, elaborate findings of fact were made to the effect that the parties had united in a joint venture or partnership, not only in the hay business, insurance business, and farm leases, but also in a considerable number of mining leases, some of which had developed into very valuable properties.   An accounting was also made between the parties, which resulted in a finding that the plaintiff was entitled to judgment against defendant in the sum of $55,042.03½, and it was recommended that a judgment for that amount be rendered, the partnership dissolved, and a receiver appointed to collect royalties, sell the partnership property, and distribute the proceeds between the partners.   Judgment was entered substantially as recommended by the referee.   The defendant appeals, and his complaint, although subdivided into numerous heads and discussed in a brief of two hundred and fifty pages, is that the evidence does not warrant the finding that a partnership in mining leases existed between the parties.

A large volume of testimony was taken, an abstract of which covers seven hundred seventy-four pages, and upon an

examination of it we conclude that a discussion of the testimony in detail in an opinion would be neither practical nor profitable. It is apparent that the case was fully tried, each party given full opportunity to present his testimony, and that careful consideration of the evidence and the contentions of the parties was given by the referee and the trial court. That the parties conducted a hay business and an insurance business for a number of years is not denied, and that they dealt as partners in leasing land for the cutting of hay and farm purposes is not open to dispute. No partnership contracts with reference to the carrying on of these lines of business were reduced to writing, except one that was executed when R. R. Heap became associated with the firm for a brief period. The real controversy between them is as to whether there was a partnership relation in taking assignments of royalties and in the leasing and development of mining lands. Their agreements as to the conduct of mines and mining leases were not committed to writing, but there was a great deal of testimony showing that this line of business, like that of the others mentioned, was conducted as partners. A corporation was organized to conduct their business, but this was soon abandoned. Some of the farm leases were taken in the name of one partner, some in the name of the other, and still others in the name of both, as seemed to be convenient or expedient. The insurance business was turned over to another, and while carrying on the hay, grain and farm leasing businesses they began taking assignments of royalties on Indian lands that had been leased for mining purposes, some being taken in the name of the plaintiff, and others in that of the defendant. About this time they began to take mining leases, the first being what is called the James lease, that had been taken in the name of the plaintiff, and it is clear that the defendant had an equal interest with the plaintiff in that mine. The Portis lease, which was a productive one, was taken in plaintiff's name, and the Lewis lease was also taken in his name. What is called the Wright lease, which defendant had made an abortive effort to secure, was subsequently obtained through the effort of a third party for them in the name of plaintiff and one Daugerty, and the compensation to the agent for securing that lease was paid from the funds of the firm.

Apple v. Smith.

The Gilmore lease was taken in the name of both partners, and this was subsequently assigned to another for a considerable sum, that was equally divided between the partners. A number of leases were taken in the defendant's name, including the Jones lease, the Goodeagle lease, and the Cedar lease, and an assignment of the Chubb lease was taken in the name of the defendant and another. Then there were three Fish leases taken in defendant's name, one in 1913, one in 1914, and the third in 1915. What are designated as the Douthat leases, one taken in February, 1915, and the second in September, 1915, were in the name of defendant. The Fish and Douthat leases, obtained not long before this action was begun, proved to be very valuable, and the claim for a division of the proceeds of these appears to have been the producing cause of this controversy. So long as the profits derived from the leases were small, there was no contention as to the interests of the parties, or the plan upon which the profits and losses were to be shared. The plaintiff testified that when they first went into business their operations were confined mainly to hay, grain and insurance, but the purpose was that they should take hold of anything out of which some money might be made, and it was done on a basis of sharing equally in the gains and losses.

The referee found that while the testimony did not show definitely a formal agreement of partnership, such a relationship was shown by conversations, correspondence, and the acts and conduct of the parties. The testimony in the record tends to show that the intention and understanding was that they should share jointly as partners in the profits and losses that might arise from mining leases, regardless of whether they were secured and taken in the name of plaintiff or defendant, or in the names of both of them, and without making a specific separate agreement as to each lease handled or transaction had. Defendant denies that there was a general understanding or agreement to include mining leases in the partnership business, and he insists that the joint interest that they had in certain mining leases was based on separate agreements in each case. Although there is much con°ict in the testimony in respect to this line of business, and some weaknesses in that given in behalf of the plaintiff, we think the testimony upon which the findings rest amply supports them.

There is testimony of admissions made by the defendant which expressly recognizes the existence of a partnership in the mining leases. Apart from the testimony of plaintiff, one witness, who approached the defendant on a proposition for a sublease, asked him how it happened that he and Apple were not securing more mining leases, and defendant replied, "We got some pretty good stuff. . . . We got that Fish lease and the Century lease." The last-named lease is another name for the Douthat lease, and it and the Fish leases are the ones which proved to be rich and profitable. To another witness, who asked him to take an interest in the mine, he said that "he and Walt (plaintiff) had so many leases on hand that they could not well take over any more." The witness continued, "he mentioned several leases. I remember his mentioning the Fish lease, the Douthat lease, and the Chubb lease, I believe. He told me it looked like they had some good prospects down there, that is, good leases, and looked like things might be coming their way soon." Another witness testified that defendant said to him and the plaintiff on one occasion, "Maybe I and Walt won't have to hay always. If our mines prove to be good on the Douthat and Fish lands we can sit around and smoke ten-cent cigars."

In defendant's testimony he admitted that negotiations to obtain a lease of the Wright land were made on the basis that he and the plaintiff were to share equally in it, and it appears that he drew a check on the account of Apple and Smith to pay for work done on this lease. One of the workers on this lease testified that part of the drilling was paid for by plaintiff and part by defendant. In a letter to plaintiff, after comments on other transactions, defendant wrote, "Don't believe we will have any trouble with our Wright leases," and he added, "I sure wish we had been farsighted enough to grab that state line stuff two years ago while Vic was guardian." In another letter he discussed the taking of leases, the validity of some that were under consideration, and also losses sustained on royalties which they held.

The manner in which payments were made in the securing of leases, the coöperation between them in procuring persons to join them in drilling on the leases so as to prevent forfeitures, together with the testimony referred to, furnish very persuasive proof of a general partnership in the taking, dis-

position, and operation of mining leases. Much is said of the lack of concern of the plaintiff as to the operation and output of the mines on the Fish and Douthat lands, but this may be explained, to some extent at least, by the fact that the development and output of the mines on these lands occurred just before and after the controversy arose between the parties, and about the time this action was brought. Evidently the plaintiff concluded at that time that the only way in which a settlement could be made to determine the rights of the parties and the dissolution of the partnership was through a judicial proceeding. Testimony was given and circumstances brought out inconsistent with a partnership relation between the parties, and defendant contends that it far outweighs that of the plaintiff, but the measure of testimony upon which the findings are based is not the apparent preponderance or plausibility of that printed in the record. It is determined here by the test, Does the supporting evidence sustain the findings? We have no hesitation in saying that it does. Many cases are cited bearing on the elements necessary to constitute a partnership and the facts which must be proven to establish it, but there is no real controversy as to the law relating to partnership, and hence there is no occasion for reviewing the cases cited. The real question upon which the parties divide is whether there is evidence to establish the existence of the well-recognized and essential elements which enter into a partnership.

Numerous objections were made to the reception and rejection of testimony, but it is plain that the referee interpreted the rules of evidence liberally and fairly, as was his duty on the issues joined, and we find nothing in the rulings which approaches material error or requires detailed discussion.

There is the further objection that, as some of the leases involved lands in Oklahoma, the court was without jurisdiction to adjudge a disposition of them or to decree that the defendant be required to account for the products and apply the proceeds of the mines to the judgment rendered. The contention is that the court was without power to render a judgment affecting a title to real estate in another state, as this judgment does. There is no difficulty on this point. This was an equitable action, in which a judgment *in personam*

was rendered. The rights of the parties were determined, including their partnership rights in land and mining leases of land situate in this and another state. Treating the leases as interests in real estate, it was competent for the court, in settling the partnership affairs, to treat real estate belonging to partners as personal property. (*Tenney v. Simpson,* 37 Kan. 353, 15 Pac. 187; *Jones v. Davies,* 60 Kan. 309, 56 Pac. 484.) Apart from this consideration, the defendant had been brought before the court on personal service, where he answered and subjected himself to the direction and control of the court as to real estate beyond its jurisdiction. It has been held that, while an action may not be brought which involves merely the possession and title to land in another state—

"A court of equity which has acquired personal jurisdiction of a defendant, may compel performance of a contract to convey land in another state or to enforce trusts as to the same, and give any equitable relief regardless of the location of the subject matter where it can be enforced against the person of the defendant." (*Caldwell v. Newton,* 99 Kan. 846, 163 Pac. 163.)

In *Huston v. Cox,* 103 Kan. 73, 172 Pac. 992, it was contended that a receiver of property beyond the jurisdiction of the court could not be appointed, and it was said:

"It is unnecessary that property constituting the subject matter of a receivership be within the jurisdiction of the court, provided the parties in interest be subject to the control of the court. In this instance the court acquired jurisdiction of the persons of the defendants by personal service and by an answer to the merits, and it would have made no difference if the property had been land." (p. 74.)

We find no error in the findings or judgment as to partnership, nor any in the accounting that was made, and therefore the judgment of the court is affirmed.